**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 30, 2011

No. 10-30570

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

KEVIN LEWIS, also known as Kevin Lamont Nicholas

Defendant-Appellant

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC No. 09-00184

Before SMITH, BENAVIDES, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Kevin Lewis was convicted by a jury of conspiracy to distribute and aiding and abetting the distribution of 100 grams or more of heroin. The district court concluded that Lewis was a career offender based on his previous convictions for possession of a controlled substance and manslaughter. The court sentenced Lewis to concurrent terms of 360 months in prison. Lewis appeals both his convictions and sentences, arguing: (1) the evidence was insufficient to support his conspiracy conviction; (2) counsel rendered ineffective assistance based on

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-30570

the failure to move for acquittal on the aiding and abetting count; (3) the prosecutor made improper remarks; and (4) his prior conviction for manslaughter did not qualify as a crime of violence under the career offender sentencing guideline. We affirm his convictions and vacate and remand for resentencing.

## I.    FACTUAL AND PROCEDURAL HISTORY

A federal grand jury in the Eastern District of Louisiana charged Lewis, along with his codefendant, James Anderson, with one count of conspiring to distribute more than 100 grams of heroin and one count of aiding and abetting the distribution of heroin. 28 U.S.C. §§ 841(a)(1) & (b)(1)(B); 18 U.S.C. § 2. At trial, the Government offered the testimony of a confidential informant, Bernel Clements. The Government also presented the testimony of FBI Special Agent Keith Burriss, Clements's control agent, and Sergeant Kevin Guillot of the New Orleans Police Department. At the time of trial, Clements, who had prior state and federal drug convictions, was serving time in prison for violating his federal supervised release conditions by incurring new state drug charges. While Clements was being held pending the revocation charge, Agent Burriss approached him about cooperating with the Government, and he agreed to do so. The state charges were dropped and adopted as federal charges, and Clements eventually received a reduction in his revocation sentence from 60 to 30 months based on his cooperation.[1]

On April 20, 2009, Clements met with Anderson in the Iberville Housing Project. Clements told Agent Burriss that he had contacted Anderson and that Anderson was dealing heroin out of a store he owned. Agent Burriss instructed Clements to purchase heroin from Anderson. On April 30, 2009, according to

---

[1] Although Clements had hoped to receive a reduced sentence on the pending charges, he had not been promised anything. He was paid $5,970 for living expenses during the time he cooperated.

2

No. 10-30570

Clements, he called Anderson, and that same evening, he went to Anderson's store and arranged to purchase 4 ½ ounces of heroin for $11,000 the next day.

The following day, May 1, 2009, Agent Burriss provided Clements with the $11,000, and Clements went to Anderson's store early that afternoon. According to Clements, Anderson did not have the heroin and placed a call to someone Anderson referred to as his "brother-in-law," telling him that Clements was there and to "bring the stuff." While Anderson and Clements waited, Anderson made several more calls to his brother-in-law. The brother-in-law arrived about 45 minutes later to pick up the money. Clements told the jury that the person who "show[ed] up" was Kevin Lewis, and he identified Lewis in court.

Anderson went to the back of the store and let Lewis in a side door; Clements went out the front door and noted the type of car Lewis arrived in and wrote down the license plate number. When he went back inside, Anderson and Lewis were still in the back of the store; although he could not see them from the front of the store, he saw when Lewis left via the side door.[2] Anderson told Clements that his brother-in-law would be "back with the stuff." Lewis returned about 45 minutes to an hour later. Anderson called Clements to the back of the store, where Lewis pulled a brown paper bag out of his waistband and extracted a plastic bag full of heroin; he handed the heroin to Anderson, who handed it to Clements. Clements then left and met Agent Burriss. Clements was at the store a total of nearly three hours.

Agent Burriss asked Clements "what took so long," and Clements told him Anderson did not have the heroin and that a "runner" brought it. Clements then told Agent Burriss that the person who delivered the drugs was in a black

---

[2] Lewis erroneously asserts that although Clements identified Lewis in court, he acknowledged that he never saw the person Anderson went to "meet in the room behind the store." Clements testified only that he could not see the men while they were in the back; he did not say he never saw Lewis. Indeed, as set forth above, Clements testified he saw Lewis pull a brown paper bag out of his waistband that contained a plastic bag "full of heroin."

## No. 10-30570

Camry and gave him the license number. Agent Burriss had other agents establish surveillance on the Camry–which was still at the store–and then requested that New Orleans police officers conduct an investigatory stop, which occurred about 90 minutes later.

Sergeant Kevin Guillot, who conducted the stop, testified that Lewis was the driver of the black Camry; however, Lewis produced a driver's license in the name of Kevin Nicholas. Lewis had a large wad of cash in his front pocket, which Guillot estimated to be about two inches thick and too large to fit in a wallet. A woman named Tracy or Stacey arrived on the scene as well and demanded to know the reason for the stop.

According to Clements, Anderson contacted him later that day and told him that his brother-in-law had been stopped by the police and that Anderson's sister went out there and was "carrying on" asking the police what they were doing with her boyfriend. Agent Burriss later testified that Anderson's sister, Stacey Anderson, was Lewis's girlfriend. Anderson said his brother-in-law wanted to meet with Clements at an IHOP restaurant to ask him if he knew anything about the stop. Clements testified that he went to the IHOP, where he called Anderson. That call was recorded and took place at 10:17 p.m., and the recording was played for the jury.[3] The recording stopped, however, and only the first part of the conversation can be heard. According to Clements, Lewis was on the call. Agent Burriss also identified Lewis's voice on the recording, stating that he recognized all three voices.

Clements testified that the next day he met with Anderson and Lewis at Anderson's store. Clements stated that Lewis asked him if he knew anything about the stop, and Clements told him he did not. Agent Burriss testified

---

[3] Although Clements testified that he received a call from Anderson, he is evidently referring to the earlier call; phone records show that Clements made the IHOP call from his number, 453-xxxx, to Anderson's phone, 338-xxxx.

No. 10-30570

regarding call records for two telephones attributed to Anderson with the numbers 504-338-xxxx (the 338 number) and 504-253-xxxx (the 253 number), as well as a telephone in Lewis's possession at the time of his arrest, with number 504-272-xxxx (the 272 number). He also testified that according to Clements, Anderson had at least three phones. Records showed 19 telephone calls between the phones associated with Anderson and the phone associated with Lewis on May 1, and 14 calls on May 2. After May 2, when the alleged meeting with Clements took place, telephone records showed only two telephone calls between those numbers through the end of June. In addition, after the recording of Clements's IHOP call had stopped, the call between Anderson's 338 number and Lewis's 272 number continued for four minutes.

At the close of the Government's case, Lewis moved for acquittal on the conspiracy count. The district court denied the motion, and the defense did not call any witnesses to testify. After deliberations, the jury found Lewis guilty as charged. The district court ruled that Lewis's 1992 Louisiana manslaughter conviction constituted a crime of violence, qualifying him for a § 4B1.1 enhancement. The enhancement elevated his offense level to 37 and his Criminal History Category to VI, resulting in a guidelines range of 360 months to life. U.S.S.G. § 4B1.1(b); Sentencing Table. Absent the career offender enhancement, Lewis would have had a total offense level of 26 and would have been in Criminal History Category IV, yielding a range of 92 to 115 months. The district court sentenced Lewis to concurrent 360-month terms of imprisonment. Lewis now appeals.

II.     ANALYSIS

A.     Crime of Violence

Lewis's principal challenge on appeal is to the district court's ruling that his prior conviction for manslaughter constituted a "crime of violence" under U.S.S.G. § 4B1.1, which rendered him a career offender under the sentencing

No. 10-30570

guidelines.[4] As this is the primary argument addressed in his brief, we address it first. More specifically, he contends that the Government failed to prove through proper court records that this prior conviction constituted a crime of violence. This case turns upon whether the Government has proven to a *legal certainty* that Lewis's prior manslaughter conviction qualified as a crime of violence. We conclude that the Government failed to make such a showing.

Lewis's challenge to the application of the sentencing guidelines is a claim of procedural error. *See Gall v. United States*, 552 U.S. 38, 51 (2007). Review of the application of the Guidelines, including a crime of violence determination, is de novo. *United States v. Bonilla*, 524 F.3d 647, 651 (5th Cir. 2008). An offense is a crime of violence under § 4B1.1 if it is punishable by more than one year in prison and (1) has as an element the use, attempted use, or threatened use of physical force against another, or (2) "is burglary of a dwelling, arson, or extortion"; involves the use of explosives; or "otherwise involves conduct that presents a serious potential risk of physical injury to another." § 4B1.2. In addition, it may be one of certain enumerated offenses, including manslaughter. § 4B1.2, comment. (n.1); *see United States v. Rayo-Valdez*, 302 F.3d 314, 317 and n.3 (5th Cir. 2002); *United States v. Fry*, 51 F.3d 543, 546 (5th Cir. 1995).

When classifying a prior offense for enhancement purposes, courts employ the categorical approach set out in *Taylor v. United States*, 495 U.S. 575, 600-02 (1990), looking to the elements of the offense as defined by the statute rather than to the facts of the defendant's conduct. *United States v. Carbajal-Diaz*, 508 F.3d 804, 807-08 (5th Cir. 2007). In *Shepard v. United States,* the Supreme Court held that "a later court determining the character of [a prior conviction] is generally limited to examining the statutory definition, charging document,

---

[4] To be deemed a career offender, a defendant, among other things, must have "two prior felony convictions of either a crime of violence or a controlled substance offense." § 4B1.1(a). Lewis does not challenge the use of his prior controlled substance conviction.

written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." 544 U.S. 13, 16 (2005). Interpreting *Shepard*, this Court has held that a "district court may not apply a particular offense level based *solely* on the PSR's conclusory characterization of a prior conviction as having been for a 'crime of violence.'" *United States v. McCann*, 613 F.3d 486, 502 (5th Cir. 2010) (emphasis in opinion) (citation omitted).

The Louisiana statute at issue defines manslaughter in two ways. First, it includes a homicide that would constitute either first-degree or second-degree murder but is committed in "sudden passion or heat of blood." La. Rev. Stat. Ann. § 14:31(A)(1). Second, it includes homicide committed without intent to cause death or great bodily harm when the offender (a) is committing or attempting to commit a felony other than first or second-degree murder, or of any intentional misdemeanor directly affecting the person; or (b) is resisting arrest in a way that is not inherently dangerous and the killing would not be murder. La. Rev. Stat. Ann. § 14:31(A)(2).

This Court has expressly held that the definition set forth in § 14:31(A)(2) of the Louisiana manslaughter statute is *not* a crime of violence because, under Louisiana law, a person may be convicted of manslaughter if death occurred during a non-violent offense. *McCann*, 613 F.3d at 503. Lewis relies on *McCann*, arguing that it is dispositive and that none of the Government's documents narrow the conviction to come within § 14:31(A)(1).

To ascertain whether Lewis's manslaughter conviction was a crime of violence, we must identify with "legal certainty" under which section of the Louisiana manslaughter statute Lewis was convicted. *United States v. Garcia*, 470 F.3d 1143, 1148 (5th Cir. 2006). As Lewis correctly argues, the court records that the Government provided to the district court show only that Lewis was convicted of manslaughter under § 14:31. No subsection of the statute is listed.

Although the indictment shows that he was originally charged with second-degree murder, that is of no moment, because the analysis turns on the offense of which the defendant was actually convicted. *See United States v. Turner*, 349 F.3d 833, 836 (5th Cir. 2003).

The Government concedes this point but nevertheless contends that Lewis made admissions to the probation officer and the court that, coupled with the records of his conviction, support a finding that he acted intentionally and thus committed manslaughter under § 14:31(A)(1). We turn to the statements in the PSR. The probation officer wrote that Lewis reported that the victim "used to bully him," that he "killed the victim because he was afraid of [the victim]," and that "he should have just walked away from the situation." The Government contends that Lewis's statements in the PSR adequately demonstrate that he acted intentionally and thus committed manslaughter under § 14:31(A)(1), which qualifies as a crime of violence. Even assuming arguendo that the admissions in the PSR demonstrate that Lewis acted intentionally, the question remains whether *Shepard* allows the district court to consider these statements.

The district court's consideration of Lewis's statements in the PSR is problematic because, as previously set forth, a "district court may not apply a particular offense level based *solely* on the PSR's conclusory characterization of a prior conviction as having been for a 'crime of violence.'" *McCann*, 613 F.3d at 502 (emphasis in original). On the other hand, this Court has repeatedly held that "reliance on a defendant's admission of facts that are contained in the PSR is permissible." *See, e.g., United States v. Ramirez*, 557 F.3d 200, 204 (5th Cir. 2009) (citing *United States v. Martinez-Vega*, 471 F.3d 559, 563 (5th Cir. 2006)). However, unlike the instant case, it appears that the cases citing this proposition have all been reviewed for plain error. Even assuming that a court may rely on a defendant's admission of facts contained in the PSR where, as here, the error has been preserved, Lewis has *not* admitted that he made those

No. 10-30570

statements. We have recognized that *Shepard* requires that a defendant legally admit the facts relied upon by the district court. *United States v. Flores-Vasquez*, 641 F.3d 667, 672-73 (5th Cir. 2011).[5] Because Lewis has not done so, the district court's reliance on the statements in the PSR was error.

We now turn to the following statements that Lewis made to the district court during his sentencing hearing:

> I just want to say it wasn't like I went out to kill anyone, like I went looking for someone to kill. It was like right by my home and this individual who had just came home off a murder charge was like a bully in the neighborhood and I was one of the guys that he was bullying and things happened that day and so fast where I felt my life was in danger. But I just want to let the Court know that I am not, you know, contesting saying it wasn't a violent crime, I am contesting saying that it wasn't –

At this point the court interjected: "The circumstances." Lewis responded: "Yes, Your Honor."[6] Because this Court has held that a district court may consider any admissions made by the defendant in its determination of whether the prior conviction constitutes a crime of violence, it was not error for the district court to consider the statements Lewis made at the sentencing hearing. *United States v. Mendoza-Sanchez*, 456 F.3d 479, 483 (5th Cir. 2006); *see also Shepard,* 544

---

[5] *But see United States v. Aviles-Solarzano*, 623 F.3d 470, 473-77 (7th Cir. 2010) (holding that it was not error, plain or otherwise, for a judge to rely on an unsubstantiated summary of a state indictment contained in the PSR to determine that the prior offense was a crime of violence even though the defendant had not admitted that the summary of the indictment was correct).

[6] Notwithstanding Lewis's express statement to the court that he was not contesting whether his prior conviction was a "violent crime," the district court interpreted the statement as an objection to the manslaughter conviction qualifying as a crime of violence under the guidelines. Indeed, the court stated that the "objection is overruled and preserved for appeal." The prosecutor responded by (1) referring to the controlling Supreme Court precedent; and (2) arguing that Lewis's statements constituted an admission that his manslaughter conviction was based on an intentional act. Under these circumstances, we conclude the issue was sufficiently raised before the district court. We further note that the Government does not argue plain error review on appeal.

9

No. 10-30570

U.S. at 26 (explaining that among other things, a court may look to a "transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant").

Nonetheless, Lewis's statements at sentencing do not establish to a legal certainty under which portion of the Louisiana manslaughter statute Lewis was convicted. These statements do not describe how the offense was committed. Nor do they indicate that the offense was committed intentionally. Accordingly, we agree with Lewis that the statements he made at sentencing are compatible with the scenario that Lewis committed manslaughter during the criminally negligent discharge of a firearm.[7] *See State of Louisiana v. Brown*, 513 So. 2d 425, 428 (La. Ct. App. 1987) (holding that illegal use of a weapon is one of the predicate offenses for manslaughter where there is no intent to cause death or great bodily harm). Because we cannot identify with legal certainty under which portion of the Louisiana manslaughter statute Lewis was convicted, the district court erred in applying the career offender enhancement to Lewis's sentence.

In the alternative, the Government argues that any error was harmless because the range without the enhancement was undisputed, the district court considered all the statutory factors for sentencing under 18 U.S.C. § 3553(a), and the court was aware that the Guidelines were not binding. A "sentencing error may not be found harmless unless the proponent of the sentence proffer[s] sufficient evidence to convince the appellate court that the district court would have imposed the same sentence, absent the error." *United States v. Ibarra-Luna*, 628 F.3d 712, 718 (5th Cir. 2010) (internal quotation marks and

---

[7] We recognize that the statements Lewis made at the sentencing hearing corroborate his reported statements in the PSR. Assuming arguendo that such corroboration would constitute an admission that he made the statements in the PSR, we conclude that the statements in the PSR do not establish that the offense was committed intentionally. Thus, even considering both the statements in the PSR and the statements made at the sentencing hearing, we are unable to identify with legal certainty whether his prior manslaughter conviction was a crime of violence.

citation omitted).  Here, there is no statement by the court or other evidence convincingly showing that the court would have imposed a sentence of 360 months regardless whether it had erred by including the career offender enhancement.  Therefore, this argument is without merit.

## B.    Sufficiency of the Evidence

Lewis next argues that the evidence was insufficient to establish that he was the person who delivered the heroin to Anderson, and thus the conspiracy conviction should be reversed.  Because Lewis moved for acquittal at the close of the Government's case on the conspiracy count and did not present any evidence, he preserved his sufficiency argument.  *See United States v. Jaras*, 86 F.3d 383, 388 n.5 (5th Cir. 1996).  We therefore review this issue under the rational jury standard, "viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict and determining whether a rational jury could have found the essential elements of the offense[] beyond a reasonable doubt." *United States v. Valdez*, 453 F.3d 252, 256 (5th Cir. 2006) (internal quotation marks and citation omitted).  The jury is solely responsible for "weighing the evidence and making credibility determinations." *Id.*  The evidence need not "exclude every rational hypothesis of innocence or be wholly inconsistent with every conclusion except guilt," so long as "a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt." *Id.*

Lewis argues that the sole issue was the identity of the person who delivered the drugs, and that this turned exclusively on the testimony of Clements, who was of doubtful credibility and had strong motivation to lie in order to curry favor with the Government.  With respect to Clements's motivation and purported eagerness to identify Lewis at trial, it is exclusively the job of the jury to weigh the evidence and determine a witness's credibility. *See United States v. Garcia*, 567 F.3d 721, 731 (5th Cir. 2009).  This is true even in the case of a witness who is compensated or cooperating under a plea bargain

or promise of leniency, unless the witness's testimony "is so incredible or insubstantial that, as a matter of law, we may discredit it." *Id.*; *United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994). "Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature." *Bermea*, 30 F.3d at 1552.

Clements admitted to the jury that the court had reduced his revocation sentence for his assistance, that he had received money from the Government, and that he hoped to receive a reduced sentence on his pending charges in exchange for his assistance; he denied having been promised anything. Lewis's counsel fully cross-examined Clements about his criminal history and the consideration he had received and hoped to receive for his cooperation. Clements's self-interest and desire to please the Government are insufficient standing alone to show that his testimony identifying Lewis as the person who brought the heroin was so incredible or insubstantial that we may discredit it as a matter of law.

Lewis next claims that there are critical inconsistencies between Clements's testimony and other evidence, showing that he fabricated testimony about events he could not have witnessed, making his identification of Lewis "incredible to any rational jury." We need not tarry long with this argument. Lewis makes much of the fact that the prosecution did not have a record of two phone calls. With respect to the first "missing" record of a phone call, Lewis's assertion that Anderson would have called the drug runner at the 272 number "promptly" after Clements delivered the money rests purely on speculation and assumption. With respect to the second call, Lewis contends that there is no telephone call from Anderson to Clements during the time that Anderson allegedly called Clements to set up the meeting at IHOP. The absence of a single phone record does not prove Clements was lying about the meeting. To the

contrary, it is undisputed that a call took place on May 1 at 10:17 p.m. between Clements and Anderson. In the recording, Clements and Anderson can be heard clearly discussing a conversation between Anderson and a third person. The content of the call supports Clements's testimony that Lewis told Anderson he wanted to set up a meeting at IHOP to discuss the stop. Further, Burriss identified the third person on the call as Lewis, stating that he recognized the voice.[8]

Moreover, much of Clements's testimony about the heroin deal that day was corroborated. Clements provided Burriss the license number and make of the car that the drug runner drove, and Lewis was stopped driving that same car, a black Camry, 90 minutes later. Burriss recalled that the Camry arrived at the store twice that day, consistent with Clements's testimony that Lewis made two trips to the store. When the police stopped Lewis, he had a two-inch stack of cash on him, supporting Clements's testimony that Lewis had picked up the $11,000 earlier during the heroin deal. Lewis also gave a false identity to the officer, a fact from which a rational jury could have inferred consciousness of guilt. *See United States v. Stowell*, 947 F.2d 1251, 1255 (5th Cir. 1991). Given all the evidence, Lewis has failed to show that Clements's testimony was fabricated or that the jury's verdict was not rational.

### C.    Ineffective Assistance of Counsel

Lewis next contends that his trial counsel rendered ineffective assistance by failing to move for acquittal on the aiding and abetting count. He argues that this has subjected him to the more stringent "devoid of evidence" standard, which he concedes he cannot meet. *United States v. Reff*, 479 F.3d 396, 400 (5th

---

[8] During Clements's initial debriefing with Agent Burriss, Clements referred to Lewis as a drug "runner." Lewis claims that referring to Lewis as a "runner" contradicts Clements's claim that Anderson said he was calling his "brother-in-law." There is nothing facially implausible about Clements initially stating that a "runner" brought the drugs, and later telling Burriss that he knew only that the person was Anderson's brother-in-law.

No. 10-30570

Cir. 2007).  He further argues that there is a reasonable probability that he could succeed under the ordinary standard of review for the same reasons he set forth with respect to the conspiracy count.

Ordinarily, the record on direct appeal is not sufficient to allow this Court to consider claims of ineffective assistance, which requires a showing both that counsel performed deficiently and that the deficient performance prejudiced the defense.  *United States v. Rosalez-Orozco*, 8 F.3d 198, 199 (5th Cir. 1993).  However, in the interest of efficiency, this Court has considered claims of failure to move for acquittal on direct appeal, reasoning that the record contains the evidence needed to examine prejudice, *i.e.*, whether there is a reasonable probability that, if counsel had "moved for a judgment of acquittal, the motion would have been granted on the basis of insufficiency of evidence." *Id.*  In the instant case, we conclude that the record is sufficiently developed on this point and will therefore address the claim.

The prejudice determination entails a review of the sufficiency of the evidence of aiding and abetting under the ordinary standard instead of the devoid of evidence standard.  *See Rosalez-Orozco*, 8 F.3d at 200.  As with the conspiracy count, there was ample evidence under the usual standard of review to support a jury finding that Lewis was the third person involved in the heroin deal.  *See United States v. Rodriguez*, 553 F.3d 380, 391 & n.5 (5th Cir. 2008) (setting out aiding and abetting elements and noting that the same evidence generally will support both a conspiracy and an aiding and abetting conviction). Accordingly, Lewis's claim of ineffective assistance of counsel fails.

D.     Improper Prosecutorial Remarks

Finally, Lewis argues that the prosecutor improperly bolstered Clements's credibility and made other improper remarks during closing arguments.  As Lewis concedes, he failed to object and review is for plain error.  To demonstrate reversible plain error, Lewis must show that (1) there is error; (2) the error is

14

No. 10-30570

clear or obvious; and (3) the error affected his substantial rights. *See Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009); *see also United States v. Gracia*, 522 F.3d 597, 600-01 (5th Cir. 2008) (prosecutorial misconduct context). The substantial rights prong ordinarily requires a defendant to show that the error affected the outcome. *United States v. Mondragon-Santiago*, 564 F.3d 357, 364 (5th Cir. 2009). In the context of improper prosecutorial remarks, this Court has held that the "determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *Gracia*, 522 F.3d at 603 (internal quotation marks and citation omitted). To resolve this question, this Court considers "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." *United States v. Thompson*, 482 F.3d 781, 785 (5th Cir. 2007). Even if Lewis meets his burden on the first three prongs of plain error, this court will not exercise its discretion to reverse unless the error "seriously affected the fairness, integrity, or public reputation of the judicial proceeding." *Gracia*, 522 F.3d at 600.

A prosecutor may not make a personal assertion regarding a government witness's credibility, cloaking the witness in the Government's "protective mantle." *Id.* at 601 (internal quotation marks and citation omitted). "A prosecutor may argue fair inferences from the evidence that a witness has no motive to lie, but cannot express a personal opinion on the credibility of witnesses." *Id.* In addition, although a prosecutor may argue inferences from the evidence, "[a] prosecutor may not directly refer to or even allude to evidence that was not adduced at trial." *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008).

Lewis first challenges the following statement by the prosecutor: "[Clements], who has been making buys successfully for the FBI over a period of six months and was never ever shown to have been untruthful." As Lewis

15

argues, the only testimony about Clements's past assistance was the fact that he worked for the Government on numerous cases for six months; there was no evidence regarding whether he was found to be successful or truthful in those cases.

Viewed in context, however, the statement could be read as a comment on Clements's in-court testimony and the lack of evidence that he had been untruthful. On the other hand, the statement could be read as implying that the prosecutor had special knowledge of Clements's prior assistance, which would be improper. *See Gracia*, 522 F.3d at 601 n.6; *Mendoza*, 522 F.3d at 491.

Nevertheless, the remark does not warrant reversal. First, the magnitude of the prejudicial effect–which is measured by looking at the remark in context and attempting to determine its intended effect–appears slight. *See United States v. Ramirez-Velasquez*, 322 F.3d 868, 875 (5th Cir. 2003). The remark immediately followed a statement by the prosecutor regarding Clements's unimpeached testimony in court. Further, it came after a lengthy summary of all the evidence, including the telephone records and recordings. Thus, even assuming the remark crossed the line, it was not "so pronounced and persistent" that it "permeate[d] the entire atmosphere of the trial." *Ramirez-Velasquez*, 322 F.3d at 875 (internal quotation marks and citations omitted).

Additionally, the district court on three occasions gave the jury detailed instructions that they were to decide the case based on the evidence rather than the statements of the lawyers. The court's repeated and careful admonishments, which the jurors are presumed to have followed, served to reduce any prejudicial effect. *See Gracia*, 522 F.3d at 604.

As previously discussed with respect to the sufficiency, the evidence of Lewis's guilt was significant. There was independent evidence that corroborated several aspects of Clements's testimony, including the surveillance of Lewis's car, the investigatory stop, and the telephone records. In short, the prosecutor's

isolated comment on Clements's credibility does not cast serious doubt on the verdict. *See Gracia*, 522 F.3d at 603.

Lewis next challenges statements on rebuttal by the prosecutor regarding the content of the dropped telephone call between Clements and Anderson that was not recorded. As Lewis argues, the content of the call was not in evidence, and the prosecutor did not preface the remark by suggesting that she was simply drawing inferences rather than making assertions of fact. However, the prosecutor did preface it by asking, rhetorically, why Lewis would want to know where Clements was. Further, after the statement, the prosecutor continued, stating, "And, ladies and gentlemen, that is why after 19 phone calls between Anderson and Lewis that day there's no more. Their plan was to stop. We're not going to do it. After talking to Bernel Clements, we're too linked up, we're not going to talk again." The Government contends that the prosecutor was simply drawing a permissible inference that the call likely pertained to Lewis's concern that Clements was an informant and that this explained why there was a sudden decrease in the calls between those telephone numbers.

These comments do not warrant reversal. There was no dispute that there was a four-minute telephone call between Anderson and a number associated with Lewis while Clements was at the IHOP to discuss Lewis's concerns about the stop. Further, the jury heard the recording and knew that the call was dropped and that there was no further conversation on the recording. In addition, some of the information the prosecutor conveyed, namely that Lewis had been stopped by the police with a large amount of cash and that Lewis gave them a fake name, was not disputed. The jury was thus unlikely to have been misled by the prosecutor's statement, rendering any prejudicial effect minimal. *See Thompson*, 482 F.3d at 785-86. In addition, as previously discussed, there was significant evidence that Lewis was guilty, and the district court gave repeated limiting instructions that statements by the lawyers were not evidence.

No. 10-30570

Thus, any error there may have been does not cast doubt on the correctness of the verdict; there was no reversible plain error.  *See Puckett*, 129 S. Ct. at 1429.

III.    CONCLUSION

For the foregoing reasons, we AFFIRM Lewis's convictions, VACATE his sentence, and REMAND for re-sentencing.